In the Matter of the Estate of MAGDALENA HAUBER, Deceased.

Surrogate's Court, New York County, April 10, 1930.

*Leon Wagman*, for the petitioner.

*Ewing R. Philbin* [*Gerald Dean* and *Edward F. Huber* of counsel], for the respondent.

O'BRIEN, S. This is a discovery proceeding brought by Otto Hauber, administrator of this estate, to secure an order directing respondent Otto Heinzmann to deliver to petitioner decedent's interest in a certain mortgage for the sum of $9,000 made by Frank Hauber to Anna Ziegler dated November 6, 1920, and also for the delivery of the sum of $1,847.18. Otto Heinzmann, the respondent, and Magdalena Hauber, decedent, were brother and sister and the children of Anna Ziegler, deceased. The latter *died November 20, 1926*, leaving a will in which after a legacy of $1,000 to St. Joseph's Church, the residuary estate was equally divided between her children, Magdalena Hauber and Otto Heinzmann. This will has been admitted to probate. Magdalena Hauber survived her mother and died January 19, 1928. The respondent claims the moneys and the mortgage above referred to as gifts from his mother, Anna Ziegler. He contends that the mortgage was given to him by an assignment alleged to have been executed *October 9, 1926*. The moneys he contends were given to him by his mother on the following dates: August 20, 1921, $1,000; October 24, 1921, $200; June 22, 1925, $180; July 8, 1926, $150; July 9, 1926, $180. He also received the proceeds of a life insurance policy under which Anna Ziegler was the beneficiary amounting to $137.18. All of these items total $1,847.18. A trial of the issues raised by these claimed gifts was had and testimony of various witnesses was taken. It appears that in *1925* Anna Ziegler went to live with her daughter, Magdalena Hauber, because Otto Heinzmann's wife objected to caring for her. She was eighty-three years old and was an invalid. The Fordham Hospital record introduced in evidence showed that from January 31, 1925, to February 5, 1926, when Anna Ziegler was a patient at that

institution, she was suffering from senility and chronic myocorditis and a possible fracture of the left hip. Heinzmann requested Otto Hauber, decedent's husband, to take Anna Ziegler to live with him. Subsequently in July, 1926, she was sent to Staten Island to spend the summer at Otto Heinzmann's home. At that time she had a bank account in the Tottenville National Bank, which account was closed out about a week after she arrived at Heinzmann's house. He claims that he received $150 out of this amount and the balance was spent by his mother on household expenses. *On October 9, 1926,* Anna Ziegler assigned to Otto Heinzmann the Frank Hauber mortgage of $9,000. At the time of the execution of this assignment there were *present Otto Heinzmann, his wife and a Mr. Charles P. Cole, a notary public,* who attested the execution of the instrument. Otto Heinzmann in securing this assignment and in obtaining the moneys from the Tottenville bank account of his mother *became the owner of all the property that his mother possessed and in October, 1926, shortly after the execution of the assignment of the mortgage, sent his mother back to his sister, Magdalena Hauber.* It is contended on behalf of the petitioner that this assignment was fraudulent, that it was obtained by collusion, that Anna Ziegler did not know what she was signing when she executed the instrument and that, therefore, this mortgage was the property of Anna Ziegler at the time of her death and passed under her will one-half to said Otto Heinzmann, her son, the other one-half to Magdalena Hauber, her daughter. The respondent contends that no fraud was practiced upon his mother by him and that the assignment of the mortgage to him was her free and voluntary act and that he is the owner of the mortgage in question. The petitioner produced as a witness Dr. Frederick Schwerd who treated Anna Ziegler in January and February, 1925. He testified that she was senile and somewhat childish. Petitioner also presented as a witness Elsa Walz, the nurse, who attended her in the house of Otto Heinzmann from February 7, 1925, to April 11, 1925, and daily for three months ending *September 14, 1926.* This witness described her conduct and actions and testified that she was irrational and senile. Mary G. Saunders, another witness, testified that she saw and talked with her at various times from November, 1925, to May, 1926. Witness described her talk and conduct and actions and testified the impression made upon her was that she was irrational. To meet the serious and onerous burden placed upon him in the situation presented upon the trial, Otto Heinzmann presented only himself and one *Charles P. Cole, a notary public,* as witnesses. Respondent's testimony was throughout unreliable and unsatisfactory. Some questions he

did not answer at all, others he answered by asking a question or with hesitating, evasive and contradictory answers. Far from being convincing, his demeanor, his attitude and his answers cast a strong suspicion over all his relationship with his aged mother and his claims of gifts from her. The following excerpt is a fair specimen of his testimony: " Q. The bond and mortgage and the bank book? A. I could not say that. I don't know. I never saw them. Q. You did not say it was in the room at your house? A. I never saw them, but I presume that they were there. By the Surrogate: Q. When did you first see them, after she died? A. Yes. By Mr. Wagman: Q. Have you the bond still in your possession? A. I don't think so. Q. Where is it? A. I don't know. Q. Did you lose it? A. I mislaid it and it disappeared. Q. You did not sell it to anybody? A. No. Q. On October 9, 1926, or a week before that, you said your mother said, ' Here, Otto, is the bond and mortgage,' is that right? A. Repeat that. Q. About a week before October 9, 1926, your mother said to you, ' Here, Otto, is the mortgage? ' A. Yes. Q. Bond and mortgage? A. No. Q. What did she say? A. ' Here is the mortgage. I want you to have that.' Q. She said, ' I wish you to have it? ' A. Yes. Q. What did you say? A. I said, ' If you want me to have that, you will have to sign papers.' Q. And what did she say? A. She said, ' All right.' Q. What happened after that? A. What happened after that? Q. Yes. A. She took them back, and I said I would have the papers got ready. Q. She took the mortgage back and you said you would get the papers ready? A. Yes. Q. What happened then? A. The papers came around. Q. Whom did you go to to get the papers made ready? The papers did not come around without your ordering them somewhere? A. Mr. Cole. Q. Who went to Mr. Cole? A. I asked him. Q. What did you ask him? A. To prepare the assignment paper, my mother wanted to assign a mortgage to me. Q. Your mother at that time took back the mortgage into her possession? A. Yes. Q. And Mr. Cole, you say, drew up the assignment? Mr. Dean: Objected to. He didn't say that. The Surrogate: Not exactly. Q. You asked Mr. Cole to draw up the assignment for you? A. Yes. Q. Did he draw it up for you? (Objected to.) Q. Did Mr. Cole draw up that assignment for you? A. I don't know; he brought it around. Q. Why did you go to Mr. Cole? A. Because I know him. Q. Was he qualified to draw up assignments of mortgages? A. Anybody can sign up that knows how. Q. Is Mr. Cole an attorney? A. Not that I know of. Q. Is he a notary public? A. Yes. Q. But when you sent to Mr. Cole your mother still had the mortgage? A. Yes. Q. And Mr. Cole

came back to you and had the assignment all drawn up, is that so? A. Yes. Q. Now you know that is not true. You know that Mr. Cole couldn't draw up the assignment if he did not have the mortgage? A. Well, I think he did. I don't remember about that now. Q. So your story about your mother taking the mortgage back and telling you all right, is not so, is that right? A. I don't remember that. Q. Is it not a matter of fact that your mother never saw that mortgage at that time? Don't look at your attorneys, but look at me and answer. Is it not the fact that your mother, Anna Ziegler, never saw that mortgage at that time? A. At what time? Q. The time when you were supposed to take the mortgage to Mr. Cole to draw up an assignment? A. She never seen it? Q. Yes. A. She certainly did. Q. You do not know whether you took it back or whether she gave it to you? A. I don't recall it. Q. What made you say that she said, all right, and took the mortgage back? A. What made her say it? Q. Yes. A. That was to my best recollection. Q. That was the only reason? A. (No answer.) Q. When the mortgage was brought back by Mr. Cole, what happened, where did he bring it? A. To my house. Q. What happened then? A. When. was that? Q. When he brought it back to your house, when was that? A. I don't know. In October, 1926 — I don't remember. By the Surrogate: Q. Why did you not go to a lawyer about this assignment? Why did you go to a notary public? A. I did. Q. Why did you not go to a lawyer? A. I didn't know it was necessary. The Surrogate: Is the notary in court? Mr. Dean: Yes. By Mr. Wagman: Q. What happened then, Mr. Heinzmann? A. What happened when? Q. When Mr. Cole brought back the papers? A. From where? Q. I don't know. You say he brought the papers back to you? A. Yes. Q. What happened then? A. My mother signed the papers. Q. What did. you say to your mother? What did Mr. Cole say to your mother? What happened? He did not stick the papers under your mother's nose and have her sign? A. To my best recollection he read part of the paper over to her. Q. Which part? A. Probably all of it. I don't recall that. Q. You do not recall whether he read any of this or not, actually? A. He read some of it. Q. You recollect that he read some of it? A. Yes. Q. Where was your mother? A. Sitting in the dining-room. Q. She was not in bed? A. No. Q. What did Mr. Cole say to her. A. What did he say? Q. Yes. A. 'Do you know what this is?' and she said, 'Yes, I know all about it,' and I think he says, 'I will have to read some to you,' which he did. Q. And what happened after he read it to her? A. She said, 'All right, I will sign it.' Q. Then what

happened after she said, ' I will sign it? ' A. She signed it. Q. You say she was sitting in a chair? Where was the chair? A. In front of the table. Q. And she went right over and took the pen and signed it? A. Yes. By the Surrogate: Q. You say that he said, ' I guess I will have to read it to you,' is that what he said? A. Yes, sir. Q. Are you sure of that language? A. Yes, sir. Q. While you are here, and to save time, I want you to tell every word that took place after Mr. Cole came in the room. Give me the conversation pro and con, back and forth; the colloquy that took place after he came to the house. A. He said to my mother ' Do you know what these papers are? ' and she said ' Yes.' He started to read them over. She said, ' Never mind all that; ' and he read part of it, and I do not know but what he read all of it. But he read quite some of it. She said, ' That is enough. I know all about it.' Q. When did she say that, after he had started or finished? A. After he got about half-way. Q. Did he stop reading then? A. Yes, to my best recollection. Q. Tell us what took place as you recall it. A. Then she signed her name. Q. Then what did he say? A. He says, Once more; she had to sign it twice. And she signed half-way through. She signed Anna, and then she said ' Help, Otto,' and I helped to sign the second signature with her hand. I recollect that. Q. Did Mr. Cole say anything further when he entered the room? Have you given us all of the conversation? A. General conversation. Q. Go back to it; it is only a couple of years ago and you were getting $9,000. Don't you know what took place? A. Not in detail. Q. Give me the story as you remember it. Say what Mr. Cole said and what you said, if you said anything, and what your mother said, if she said anything, something more than you have told us. You do not get excited if I talk out loud? A. No, sir. Q. You are not afraid of me? A. No, sir. Q. Give us your best recollection and the whole story. A. I told my mother when Mr. Cole came, I said, ' Mr. Cole is here for you to sign those papers,' and she says, ' All right.' She came down and sat in the room in a chair facing the north. Mr. Cole stood there and I stood there, and my wife was there. Q. Was this a private dwelling or a flat? A. This is a house. Q. And she had been upstairs? A. Yes, sir. Q. And then after you located these people, what took place? A. Mr. Cole took out the papers and read them and she says, ' I know what this is.' She said That is enough. How far he read I could not say, but he read some of it. Q. Did your mother read it? A. No. Q. Could she read English? A. Yes. Q. She understood English and could read it? A. Yes. Q. Her eyesight was good? A. Not the best toward the last. Q. Did she wear glasses?

A. Yes. Q. Are you sure she did not look at it? A. Oh, yes, she looked at it. Q. Did she look at the paper? A. Yes, sir. Q. Did she read it? A. Part of it, I think. She looked at it. Q. Did Mr. Cole hand it to her and she read that over? A. No, sir. Q. If she did not read it at the time she was signing it, she did not read it at all? A. No, sir. Q. Is there anything else you remember? A. She said she wanted me to have that after it was signed and before it was signed. Q. Were there any other papers there at the time? A. (No answer.) Q. She signed this on a table in the dining room? A. Yes. Q. Was the mortgage there or the bond there on the table at the time? A. I do not recall. Q. What happened after she signed it? A. She gave it to me. Q. Did she hand it to you? A. Yes, sir. Q. What did you do with it? A. I gave it to the wife or laid it on the table. Q. Did you have possession of it ever since? A. The mortgage, yes. Q. I am talking about this assignment. A. The assignment, yes, sir. Q. You did not have the mortgage? A. No, sir. By Mr. Wagman: Q. I show you this assignment and the two signatures there, and will you tell us again how those two signatures were placed on that paper? A. She signed this. Q. And who signed that? A. I don't know. Q. She signed it all herself? A. All I remember helping her is from here (illustrating). Q. From the ' g ' on, on the second signature? A. Yes. Q. And the first signature you did not see her sign? A. I do not remember. Q. That first signature is much better than the second, in spite of the fact that you helped her on the second? A. Yes. Q. In January of 1925, when your mother fell, her right arm was hurt, wasn't it? (Objected to. Objection overruled. Exception.) Q. Mr. Cole is a friend of yours, is he not? A. Yes, sir. Q. He represented you at the time of the drawing of these assignments? A. Yes, sir. Q. You did not think your mother needed anybody to represent her, did you? A. I think she had somebody to represent her. Q. Who was that? A. Me. Q. Yourself? A. Yes, sir. Q. And that was sufficient, is that so? Will you answer that question? You think that was sufficient representation for your mother? A. I think so, yes. Q. Did you represent your mother at the times when she gave you those gifts of money I asked you about in the discovery proceeding here? When she gave you the thousand and the $350 and the $180 and so forth, she had nobody to represent her at the time she gave you the thousand you said you got from her? A. (No answer.) Q. Did she ever have an attorney when she gave you money? A. No."

*The testimony of the notary public, Cole, was weak and unconvincing. It related only to the matter of the alleged assignment of*

*the mortgage. The following excerpt indicates the quality of his testimony:* " Q. Will you tell the Court exactly what transpired when you brought this assignment of mortgage and any other paper that you might have had with reference to this transaction, to the residence? A. I recall having started — I either started to read this instrument or I asked her if she wanted me to read it. I think I started to read it and she told me she knew what it was and she wanted Otto to have it. That is not a verbatim statement, but that is the sense of what she told me. I would not attempt to quote it exactly. Q. Did she read any part of this instrument herself? A. I do not know what she did. I think she — she looked at it, certainly, but I don't remember whether she read any particular part. I have a recollection of starting to read it. Q. Did she stop you? A. I think she did, yes. Q. And what did she say to you then? A. Well, she said, I know what it is. I want Otto to have it. Q. Did she then sign this instrument in your presence? A. Yes. Q. And you took her acknowledgment as notary? A. Yes. Mr. Wagman: The questions are all leading. Q. Were the acts of Anna Ziegler at the time she signed this paper rational or irrational? (Objected to. Objection sustained. Exception.) Q. After she signed the instrument what was done with it? A. I do not recall what was done immediately, but I took it with me and took it to the County Clerk's office, but how soon after I do not recall. Cross-examination by Mr. Wagman: Q. Did Otto Heinzmann approach you to have the assignment drawn? A. Yes. Q. When was that, do you remember? A. I could not remember the exact date. Q. What did he say to you at that time, do you remember that? A. I remember that he told me that his mother had a mortgage which she wanted to give him, *and he consulted with me about it.* I would not attempt to give you the exact conversation. Q. What did you tell him? A. I told him that he would have to have an assignment prepared and executed. Q. Did you tell him that you would have to have a memorandum to execute the assignment? A. I perhaps did. Q. And in order to draw the assignment he had to give you the mortgage? A. Yes. Q. So you had the mortgage at the time he spoke to you and told you to do it. A. No. If he gave me the mortgage he gave it to me subsequent to the conversation I had. Q. *Before you drew it he gave it to you?* A. *Yes, I didn't draw it.* Q. *Did you think, at the time when Mrs. Ziegler had this alleged assignment — did you think it was necessary to have someone to read it to her?* A. *No sir.* Q. You say that she stopped you right at the beginning? A. No, not at the beginning. Q. Whereabouts? A. After I had read some part of it. I don't remember

how much. Q. Then you say that she did not tell you in word that she wanted Otto to have it; how did she tell you? A. She said just that, I think. Q. Did she go this way to you (Illustrates)? A. I don't remember that. Q. *You said before that she did not say it in that way, but sort of nodded. Will you explain that to us?* A. *Yes. She interrupted me when I started to read it. That is my best recollection.* Q. You would not swear that she said exactly that she wanted Otto to have it, but somehow you got the impression that was what she wanted? A. That is the sense of what she told me. Q. You took the assignment with you to have it recorded? A. Yes. Q. As soon as Mrs. Ziegler signed it you took it? A. I do not know how quickly afterward. Q. You took it and went to have it recorded? A. That same afternoon, yes. By the Surrogate: Q. *Why did you not tell Otto Heinzmann to go and get a lawyer?* A. *Why, your Honor, I did tell Otto that it would have to be prepared by a lawyer, and I had it prepared by a gentleman who was a friend of Otto's and mine. I didn't draw it.* Q. You did not draw it? A. No, sir. Q. You heard Otto's testimony? A. Yes. Q. *He didn't say anything about a lawyer, did he? You know that it is illegal for a notary to do law business, don't you?* A. *Certainly I do.* Q. *Why didn't you have a lawyer come there and take charge of the execution of it?* A. *I didn't think it was necessary.* Q. *That is law business, is it not?* A. *I expect it is, yes.* Q. *The validity of the whole transaction depends practically on the execution.* A. *Yes.* Q. *Have you given us all of the conversation that took place?* A. *I would not attempt to give it.* Q. *Why not?* A. *I do not recall it all.* Q. *This was law business, didn't you realize that?* A. *I did not realize it.* Q. *Now try and tell us just what took place in that room; who was there; what is the attorney's name?* A. *Charles A. Marshall.* Q. *You did not witness it?* A. *No. He drew it up for me, or his office did.* Q. *Tell us your best recollection, so far as you can recall it now, what took place in that dining-room when you were there?* A. *Do you want to know who was present?* Q. *Tell me the whole story as if this is the dining-room and there enters Charles P. Cole, and tell me what transpired from that time until you took your hat and went away.* A. *I went in there and I produced the assignment and started to read it to Mrs. Ziegler, and she, as I said, interrupted me and said that she understood what it was; she wanted Otto to have it.* Q. That was all that was said? A. No, I would not say that. Q. Did you say, Good morning or Good afternoon? A. I perhaps did. Q. Did she say nothing more than that? A. She certainly did. Q. *Now search your memory. This is important. Give me every word that she uttered.* A. *I would not attempt to do that.* Q. *I want you to do the best that*

*you can.* A. That is what I did. Q. Will you say that you do not remember anything more? A. No. I doubtless discussed her health with her. Q. I do not want 'doubtless.' I do not want you to draw on your imagination. But I ask you for everything she said during the time you were in that room. A. Well, I would hesitate to try to tell you everything that she said. I don't remember. Q. Tell me everything you remember that she said. A. Well, she said when I started to read it, she said that she understood what it was; she wanted Otto to have it. Q. To have it? A. To have the mortgage. Q. Did she say 'the mortgage?' A. I do not remember. Q. Did she say it? A. She probably said it. Q. Go ahead. A. Then she started to sign her signature after I had told her where to sign it, and when it was partly completed she asked Otto to help her. Q. And what did she say as she asked him? A. I think she said, 'Otto, help me,' and Otto took hold of her hand and the signature was completed, and I asked her if she acknowledged that as her signature, and she assented. Q. Shook her head? A. Yes. Q. She did not say 'yes?' A. I do not know that she did. Probably she did not. Then I signed it and turned it over to her. The Surrogate: Any further questions? Mr. Dean: No. By Mr. Wagman: Q. You know that she was a very old lady at the time? A. Yes."

No evidence was offered by Heinzmann to sustain his claim that the gifts of money were genuine and valid except his mere statement that his mother gave him the moneys in question. He has failed utterly to sustain the burden of proof as to these gifts. It nowhere clearly appears that Anna Ziegler knew what she was doing when she executed this assignment and the burden of proof must be borne by the party claiming the validity of the gifts — in this case the respondent, whereas on the contrary it is very difficult to avoid the conclusion that advantage was taken of the infirmities of his mother by respondent (*Matter of Booth*, 215 App. Div. 516; *Matter of Housman*, 182 id. 37; *Matter of Humphrey*, 183 N. Y. Supp. 133; *Matter of Canfield*, 176 App. Div. 554); and the proof must be definite, clear, convincing, strong and satisfactory before such gift can be sustained. (*Matter of Van Alstyne*, 207 N. Y. 298, at p. 308; *Matter of Wright*, 121 App. Div. 581; *Matter of Cofer*, 121 Misc. 292; *Miller* v. *Silverman*, 247 N. Y. 447.) The gift must be established by a fair preponderance of all the evidence. (*Ward* v. *N. Y. Life Insurance Co.*, 225 N. Y. 314; *McKeon* v. *Van Slyck*, 223 id. 392.) In this case all the evidence points inevitably to the conclusion that Anna Ziegler did not comprehend the effect of the assignment and that it was procured by fraud. The gifts claimed, therefore, have not been established by the respondent

who will be directed by an order submitted with notice of settlement to return all of said property to the estate of Anna Ziegler, or if all the debts, administration expenses and legacies in said estate have been paid and distribution has been made, said order shall direct payment of one-half of said moneys with interest and one-half the amount of said mortgage with interest thereon accrued since the date of the alleged assignment thereof to the petitioner herein.